JUDGE MARRERO

13 CIV 5537

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VIVA RAILINGS, LLC and REGAL RECYCLING, INC. on Behalf of Themselves and all Others Similarly Situated,<br><br>      Plaintiffs,<br><br> v.<br><br>GOLDMAN SACHS GROUP INCORPORATED, GS POWER HOLDINGS LLC, and METRO INTERNATIONAL TRADE SERVICES LLC,<br><br>      Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |



RECEIVED
AUG 08 2013
U.S.D.C. S.D. N.Y.
CASHIERS

# TABLE OF CONTENTS

Page

SUMMARY OF ALLEGATIONS ................................................................................. 1

JURISDICTION AND VENUE ................................................................................. 2

PARTIES................................................................................................................ 4

FACTUAL ALLEGATIONS...................................................................................... 5

    The Hoarding Activities of Goldman, GS Holdings, and Metro Have Resulted
    In An Enormous Stockpile of Aluminum. ......................................................... 7

    Goldman, GS Holdings, and Metro Create Delays By Shifting Aluminum
    Between Warehouses Instead of Delivering It To Users. ................................... 8

    Defendants' Warehousing Scheme Resulted In Higher Prices. ......................... 9

    Defendants Have Monopoly Power in the Relevant Market ........................... 11

        The Relevant Market ................................................................................ 11

        Defendants Monopoly Power................................................................... 12

    Goldman May Also Profit From The Manipulated Aluminum Prices
    Through Commodity Derivatives...................................................................... 12

PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY................................ 14

CLASS ACTION ALLEGATIONS ............................................................................. 15

COUNT ONE
Violations of Section 2 of the Sherman Act .............................................................. 17

PRAYER FOR RELIEF............................................................................................. 18

JURY DEMAND. .................................................................................................... 19

Plaintiffs VIVA Railings, LLC and Regal Recycling, Inc. ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, disgorgement and other relief pursuant to the federal antitrust laws for injuries to themselves and members of the proposed Class consisting of all individuals and entities who directly purchased aluminum, pursuant to a contract with a price term based, in any part, on the Midwest Premium or Platts MW Premium or similar terminology (including but not limited to an averaging over a period of days of any such premium) in the United States between February 2010 and continuing until such time as Defendants' activities and their effects cease (the "Class Period").

## SUMMARY OF ALLEGATIONS

1.      Between in or about February 2010 and continuing through the present (the "Class Period"), Defendants Goldman Sachs Group Inc. ("Goldman"), GS Power Holdings LLC ("GS Holdings"), and Metro International Trade Services LLC ("Metro") (as defined below, and collectively the "Defendants") monopolized the warehousing of London Metal Exchange ("LME")-approved aluminum in the United States and restrained trade in, and manipulated prices of, aluminum. Defendants thereby have violated Section 2 of the Sherman Act, 15 U.S.C § 2.

2.      In February 2010, Goldman purchased Metro and commenced a practice of anticompetitive activities to ensure the storage of large quantities of aluminum in the Defendants' warehouses and then withhold the warehoused aluminum from fabricators, processors, and other types of users resulting in the artificial inflation of the price of aluminum. These activities include, but may not be limited to, offering incentives (1) to producers of

aluminum to store their inventory at Defendants' warehouses, and (2) to commodity traders to enter into long-term warehousing contracts so the aluminum would be withheld from users of aluminum.

3.      Defendants have created an aluminum stockpile of nearly 1.5 million tonnes, equivalent to over 80 percent of all LME-approved aluminum stored in North America.

4.      Defendants engaged in this warehousing scheme in order to obtain market power over the North American primary aluminum market and then tactically delay the shipment of purchased aluminum to fabricators, processors, and other users of aluminum.  The result of this warehousing scheme increased the prices of aluminum in North America.

5.      In addition, by cancelling and un-cancelling warrants listed on the LME and engaging in the warehousing scheme, Defendants have been able to manipulate the inventory and prices of aluminum and Goldman had been able to possibly profit from this manipulation through Goldman's derivative positions.

6.      Through their actions in: (1) monopolizing LME-approved warehousing of aluminum in the United States; (2) creating a hoarding effect in aluminum through incentives and through restricting the amount of aluminum that is delivered to aluminum purchasers; (3) increasing storage rents and therefore premiums attached to the spot prices of aluminum; and (4) shuffling aluminum among warehouses to take inventory dark and then public which could benefit Goldman's aluminum-based derivative trading; Defendants have unlawfully monopolized aluminum warehousing and restrained trade in and manipulated prices of aluminum, harming Plaintiffs and members of the Class.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, because

Plaintiffs' claims arise under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violations of Section 2 of the Sherman Act, 15 U.S.C. §2.

8.      Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) and 28 U.S.C. § 1391(b), (c) and (d) because one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District. Goldman's principal executive offices are located in this district at 200 West Street, New York, N.Y.

9.      Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint. The Defendants engaged in conduct that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

10.      The activities of the Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.  Aluminum is sold in the flow of interstate commerce.

11.      By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Class. The Defendants, directly and through their agents, engaged in activities affecting all states, monopolizing LME-approved warehousing of aluminum in the United States to manipulate prices in the United States for aluminum, which unreasonably restrained trade and adversely affected the market for aluminum.

12.      The Defendants' unlawful conduct described herein adversely affected persons and entities in the United States who purchased aluminum including Plaintiffs and the members

3

of the Class.

## PARTIES

13.     Plaintiff VIVA Railings, LLC ("VIVA Railings") is a limited liability company based in Lewisville, Texas.  Viva Railings manufactures a contemporary range of modular railing systems, including models that incorporate aluminum, which it purchases from suppliers in the United States.  Plaintiff purchased aluminum during the Class Period at a price based upon the Midwest Premium[1] and was injured in its business as a result of Defendants' unlawful conduct.

14.     Plaintiff Regal Recycling, Inc. ("Regal") is a Michigan corporation with its principal place of business location in Howell, Michigan.  Since 1993, Regal has grown to become one of Michigan's largest ferrous and non-ferrous scrap metal dealers, with annual purchases of aluminum in the millions of dollars.  During the Class Period, Regal has entered into well over a hundred commercial contracts for aluminum from sellers based upon various benchmarks including the Platts MW Midwestern Premium and LME prices.

15.     Defendant Goldman Sachs Group Inc. is a global investment banking and securities firm incorporated in Delaware with its principal place of business in New York, New York.  For 2012, Goldman produced net revenues of $34.2 billion, and net earnings of $7.5 billion increased by 68 percent from $4.4 billion in 2011.  In February 2010, Goldman purchased Metro International Trade Services LLC via Goldman's subsidiary GS Holdings.

16.     Defendant GS Power Holdings LLC is a significant subsidiary of Goldman Sachs Group, Inc.  GS Holdings acquired Metro International Trade Services LLC in February 2010.

---

[1] The Midwest Premium or Platts MW Premium or US Midwest aluminum premium was originally created to cover the freight from Baltimore to the Midwest. It now incorporates supply and demand of the North American-specific market to complement the LME aluminum contract and is thus the benchmark used for physical trading of aluminum in North America.

GS Power Holdings is located at 85 Broad Street, New York, New York 10004.

17.     Defendant Metro International Trade Services LLC is a global warehouse operator, specializing in the storage of non-ferrous metals for the London Metal Exchange (the "LME" or "Exchange"). Metro is a subsidiary of Goldman and GS Power Holdings LLC and has warehouses at 6850 Middlebelt Rd., Romulus, MI 48174. Metro stores aluminum in 29 of the 37 LME-approved industrial warehouses located in Detroit and has additional LME-approved warehouses in Chicago, IL, Mobile, AL, Toledo, OH, and New Orleans, LA.

18.     As used herein, "Defendants" refers to Goldman, GS Holdings, and Metro.

## FACTUAL ALLEGATIONS

19.     The United States' aluminum industry annually produces about $40 billion in products and exports. Aluminum is used in commercial and consumer products. Slightly less than 50 percent of the aluminum used in North America comes from domestically produced primary aluminum while about 30 percent is derived from recycled materials. The remainder is imported from other countries.

20.     The LME is the world center for industrial metals trading. More than 80% of global non-ferrous business is conducted on the Exchange and the prices on its three trading platforms are used as the global benchmark. The LME states that it protects the integrity of the LME's markets by monitoring that trading is fair, transparent and markets are orderly.

21.     The LME network of approved storage facilities (warehouses) extends across 36 locations in 14 countries. Located in areas of net consumption and logistical hubs for the transportation of material, every location and warehouse company must meet set criteria before being approved for LME delivery.

22.     Goldman, through Metro, controls 76 of the 160 U.S.-based LME-approved

warehouses.[2]  The following table illustrates the location and control of U.S. LME-approved warehouses and aluminum:

| U.S. City | Number of LME-Approved Warehouses | Defendants' Control of Warehouses Per City | Percentage of U.S. LME-approved primary aluminum Per City |
|---|---|---|---|
| New Orleans | 56 | 19, or 34% | 0.03% |
| Detroit | 37 | 29, or 78% | 80.88% |
| Chicago | 19 | 7, or 36% | 0.78% |
| Mobile | 17 | 14, or 82% | 3.89% |
| Baltimore | 16 | 0 | 13.52% |
| Toledo | 7 | 5, or 71% | 0.55% |
| St. Louis | 3 | 1, or 33% | 0% |
| Los Angeles | 2 | 0 | 0.35% |
| Owensboro | 2 | 0 | 0% |
| Long Beach | 1 | 1, or 100% | 0% |
| **TOTAL:** | **160** | **76, or 47%** | 100% |

23.    The cost of aluminum was, and continues to be, based upon the Midwest Premium and LME prices.  The Midwest Premium and LME prices are based, in part, on the value of the spot and delivery price of aluminum.

24.    The rise of aluminum prices during the Class Period is counterintuitive because between 2010 and 2012, LME aluminum stocks in Detroit rose from 900,000 tons to an all-time high of 1.49 million tons. Under typical circumstances, this would have put downward pressure on the premium, as it would imply that more metal was available to the market.

25.    Instead Defendants have engaged in the anticompetitive activities alleged herein which has artificially driven up the aluminum premium and damaged Plaintiffs and members of

---

[2] *See* http://www.lme.com/~/media/Files/Warehousing/Approved%20warehouses/LME%20listed%20 warehouses.pdf

the Class.

**The Hoarding Activities of Goldman, GS Holdings, and Metro Have Resulted In An Enormous Stockpile of Aluminum.**

26.   Goldman, GS Holdings, and Metro offer incentives to producers to store aluminum in the Metro warehouses and incentives to aluminum speculators to renew leases for storage of their aluminum.  Both types of incentives work to create an enormous stockpile of aluminum resulting in delaying the transfer of aluminum to fabricators, processors and other users.

27.   After Goldman purchased Metro in 2010, the warehouse company began to encourage the stockpiling of aluminum by initially paying a hefty incentive to traders who stored their aluminum in the warehouses.

28.   Cash incentives have essentially created a 'floor' under the Midwest Aluminum Premium as the premium needs to be high enough to entice metal away from the warehouses and back into the market. In 2010, incentives were as low as \$60/t (2.7¢/lb), but rose to \$120/t (5.4¢/lb) by the end of the year. In 2011, incentives were offered around \$150/t (6.8¢/lb), and in 2012 were as high as \$180/t (8.2¢/lb). In January 2013, these incentives rose further to \$210/t-\$215/t (9.5¢/lb to 9.8¢/lb).

29.   Between 2010 and 2012, LME aluminum stocks in Detroit rose from 900,000 tons to an all-time high of 1.49 million tons. Under typical circumstances, this would have put downward pressure on the premium, as it would imply that more metal was available to the market.  Prices for LME aluminum, however, increased and cost Plaintiffs and the Class more to purchase aluminum.

30.   Moreover, capitalizing on the popularity of long-term warehouse finance deals, a majority of Goldman's warehouse aluminum stocks are tied up in long-term deals and thus

'unavailable' to the market such as fabricators, processors, and other type of users.

31.    The vast majority of the aluminum being moved around Metro's warehouses is owned not by manufacturers or wholesalers, but by banks, hedge funds, and traders. They buy caches of aluminum in financing deals. Once those deals end and their metal makes it through the queue, the owners can choose to renew them, a process known as rewarranting.

32.    To encourage aluminum speculators to renew their leases, Metro offers some clients incentives of up to $230 a ton, and usually moves their metal from one warehouse to another, according to industry analysts and current and former company employees.

33.    As a result of the Defendants' warehousing scheme, Metro currently holds nearly 1.5 million tons of aluminum in its Detroit facilities, approximately 80 percent of total LME aluminum stocks in the United States.

**Goldman, GS Holdings, and Metro Create Delays By Shifting Aluminum Between Warehouses Instead of Delivering It To Fabricators, Processors and Other Users.**

34.    LME rules require that metal cannot simply sit in a warehouse forever. At least 3,000 tons of the stored metal must be moved out each day for a warehouse company holding more than 900,000 tons of metal in one location.[3]

35.    This rule is created specifically to prevent situations whereby large warehouses can build up big stockpiles and charge for storage while they deliver metal at a limited rate to aluminum purchasers.

36.    However, Goldman, GS Holdings, and Metro simply shuttle large quantities of aluminum from one warehouse to another to circumvent this rule.

37.    The shuttling of aluminum among its facilities causes long queues and further

---

[3] See, LME POLICY REGARDING THE APPROVAL OF WAREHOUSES, [REVISED 1 APRIL 2013], Common standards of working practices and facilities for warehouses, *available at* http://www.lme.com/~/media/Files/Warehousing/Approval%20process/LME%20policy%20for%20warehouses.pdf

lengthens the storage time prior to getting to fabricators, processors, and other types of users.

38.     This practice creates long delays, allowing Goldman, GS Holdings, and Metro to continue charging a daily rent of 48 cents a ton.

39.     The combination of the financing deals and the metal trapped in Detroit depots, means only a fraction of the inventories are available to the market.

40.     Before Goldman bought Metro three years ago, warehouse customers, such as Plaintiffs and the Class, waited an average of six weeks for their purchases to be located, retrieved by forklift, and delivered to factories.  After Goldman purchased Metro, the wait grew more than 20-fold — to more than 16 months, according to industry records.

**Defendants' Warehousing Scheme Resulted in Higher Prices.**

41.     Metro charges rent each day for the stored metal and as a consequence, the stockpiling, long queues, and subsequent storage time result in larger profits for Defendants.

42.     Storage cost is a major component of the "premium" added to the price of all aluminum purchased in the spot market purchased by Plaintiffs and the Class.  Therefore, the delays result in higher prices for nearly everyone who purchases aluminum or aluminum products.

43.     Because this increase in premium that is added to the price of all aluminum sold on the open market, these higher prices even affect the aluminum that does not pass through Defendants' warehouses.

44.     Aluminum industry analysts say that the lengthy delays at Metro since Goldman took over are a major reason the premium on all aluminum sold in the spot market has doubled since 2010.  The result is an additional cost of about $2 for the 35 pounds of aluminum used to manufacture 1,000 beverage cans, investment analysts say, and about $12 for the 200 pounds of aluminum in the average American-made car.

45.     As Defendants' holdings of aluminum grew — from 50,000 tons in 2008 to 850,000 in 2010 to nearly 1.5 million currently — so did the wait times to retrieve metal and the premium added to the base price. The following chart illustrates the rise in premiums since 2010 and the relationship between the premiums and the stockpile of aluminum:



46.     For example, premiums for physical aluminum in the U.S. Midwest hit $210 a tonne in May 2011, up about 50 percent from late 2010. The premium represents the amount paid above the LME's cash contract which was trading at the time at $2,620 a tonne.

47.     Moreover, aluminum premiums from 2011 to the present have actually risen while the base aluminum price fell as illustrated in the following chart:



Source: CRU

**Defendants Have Monopoly Power In The Relevant Market.**

**The Relevant Market**

48.      The relevant product market is the market for primary aluminum.  Aluminum is a commodity with unique attributes and characteristics for which it is purchased as ingots, bars, pellets, and sows.  The geographic market for aluminum is the continental United States.

49.      Defendants have entered into the Relevant Market in which Plaintiffs and other Class members purchased aluminum with prices correlated to the Midwest Premium or Platts MW premium price, and have paid inflated prices for aluminum in that market through Defendants' anticompetitive activity.

50.      Through their warehousing scheme, e.g., shuttling aluminum between warehouses, and slow load-out rates, Defendants have engaged in activities to obtain market power over the relevant product market and then acted to restrict significant supplies of aluminum from the market, thus removing those supplies from the market, and have restrained trade and manipulated prices in the aluminum market.

**Defendants' Monopoly Power**

51.     Defendants have monopoly power in the Relevant Market as a result of its ownership of 29 of the 37 LME-approved Detroit warehouses which stockpile over 80 percent of the LME-warranted aluminum in the United States.

52.     Defendants control at least 80 percent of the LME-approved Detroit warehouses and over 80 percent of the LME-warranted aluminum in the United States.

53.     Defendants control at least 80 percent of the output (e.g., transfer) of LME-approved aluminum and intentionally created distortions in the market by a hoarding effect in aluminum through incentives, shuffling aluminum among warehouses, and by restricting the amount of aluminum that is delivered to aluminum purchasers.

54.     Defendants have inflated aluminum prices including the Midwest Premium or Platts MW Premium price.

55.     Unless enjoined as alleged herein, Defendants will continue their abuse of their monopoly power, further exacerbating the anticompetitive impact on the U.S economy.

**Goldman May Also Profit From The Manipulated Aluminum Prices Through Commodity Derivatives.**

56.     Commodities trading is an essential part of Goldman's trading portfolio. In its annual report last year, Goldman reported commodities trading income of $1.5 billion in 2011 and 2010 and $575 million in 2012. The figure for 2011 represents about a sixth of Goldman's trading revenues for that year.

57.     Moreover, Goldman has increased its exposure to the global commodities market over the past year, evident from the increase in its commodities portfolio size from $5.8 billion in 2011 to $11.7 billion in 2012.

58.     Goldman enters into various types of commodities derivatives, including:

- Futures and Forwards: Contracts that commit counterparties to purchase or sell financial instruments, commodities or currencies in the future;

- Swaps: Contracts that require counterparties to exchange cash flows such as currency or interest payment streams. The amounts exchanged are based on the specific terms of the contract with reference to specified rates, financial instruments, commodities, currencies or indices; and

- Options: Contracts in which the option purchaser has the right, but not the obligation, to purchase from or sell to the option writer financial instruments, commodities or currencies within a defined time period for a specified price.

59.    Having access to, and being involved in the physical markets, provides a perspective, and certain advantages, unavailable to non-warehouse owners.

60.    For example, knowing that aluminum stocks are low, investors such as Goldman could bet that the price for aluminum will rise.

61.    Another advantage is the ability to easily cancel and un-cancel warrants[4], to take advantage of any changes to the structure of aluminum's futures curves.

62.    When the aluminum market moves towards a condition where the price of a forward or futures contract is trading below the expected aluminum spot price at contract maturity, a situation referred to as backwardation, warehouse owners could benefit by taking inventory dark i.e. store the aluminum in private facilities, and by establishing derivative positions which would benefit from an apparent destocking effect — even though the aluminum collateral is not heading to market at all.

63.    Conversely, when the market moves towards a situation where the futures price (or forward price) of aluminum is higher than the expected spot price, a situation referred to as contango, warehouse owners can take the dark inventory public, presenting the appearance of a sudden surplus and glut in supply (even though the glut was always there).

---

[4] A warrant is a document of possession, issued by the warehouse company, for each lot of LME-approved metal held within an LME-approved facility. Warrants are used as the means of delivering metal under LME contracts.

64.    By cancelling and un-cancelling warrants, moving the aluminum among warehouses, and thereby taking inventory dark and then public again, warehouse owners are able to manipulate the inventory and prices of aluminum and profit from this manipulation through their derivative positions.

65.    Ownership of the warehouses is critical to keep the dark inventory out of sight of public eyes due to the LME warrant system and the scrutiny of third-party providers.

66.    Through their actions in: (1) monopolizing LME-approved warehousing of aluminum in the United States; (2) creating a hoarding effect in aluminum through incentives and through restricting the amount of aluminum that is delivered to aluminum purchasers; (3) increasing storage rents and therefore premiums attached to the spot prices of aluminum; and (4) shuffling aluminum among warehouses to take inventory dark and then public which could benefit their aluminum-based derivative trading; Defendants have unlawfully monopolized aluminum warehousing and restrained trade in and manipulated prices of aluminum, harming Plaintiffs and members of the Class.

67.    In a letter dated July 18, 2013, the U.S. Commodity Futures Trading Commission ("CFTC") asked companies to "retain, preserve, and safeguard against destruction all documents, communications, and other information and materials" concerning or relating to any warehouses that store physical metals against a futures contract.  Having heard complaints from a number of metal users, CFTC commissioner Bart Chilton has stated, "The warehouses charge storage fees and the bottlenecks can impact prices and potentially move markets. That's not right."

## DEFENDANTS' ANTITRUST VIOLATIONS

68.    Beginning in approximately February 2010, and continuing until at least through today, the exact dates being unknown to Plaintiffs, Defendants engaged in the monopolization of

14

the LME-approved warehousing of aluminum in the U.S., the restraint of trade in aluminum, and the manipulation of the prices of aluminum.

69.     In formulating and effectuating the monopolization and manipulation, Defendants engaged in anticompetitive activities, the purpose and effect of which were to monopolize, restrain trade in, and manipulate prices of aluminum.    These activities included: (1) monopolizing LME-approved warehousing of aluminum in the United States; (2) creating a hoarding effect in aluminum through incentives and through restricting the amount of aluminum that is delivered to aluminum purchasers; (3) increasing storage rents and therefore premiums attached to the spot prices of aluminum; and (4) shuffling aluminum among warehouses to take inventory dark and then public which could benefit Goldman's aluminum-based derivative trading.  Defendants knowingly acted in order to monopolize, manipulate, and restrain trade.

## ALLEGATIONS OF ANTITRUST INJURY TO PLAINTIFFS AND THE CLASS

70.     Defendants' monopolization, restraint of trade, and price manipulation conduct had severe adverse consequences on competition in purchasing aluminum and price discovery. Plaintiffs and other members of the Class who purchased aluminum during the Class Period were deprived of normal, competitive trading patterns and instead subject to artificially manipulated prices as a result of Defendants' unlawful conduct. As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

## CLASS ACTION ALLEGATIONS

71.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated. The "Class" is defined as:

> All persons or entities other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not

named in this Complaint) who were direct purchasers of aluminum, pursuant to a contract with a price term based, in any part, on the Midwest Premium or Platts MW Premium or similar terminology (including but not limited to an averaging over a period of days of any such premium) in the United States between February 1, 2010 through such time as the effects of Defendants' illegal conduct ceased.

72.     The Class is so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members traded aluminum during the Class Period.

73.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

74.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, including commodity manipulation and antitrust class action litigation.

75.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> (a) Whether Defendants monopolized, attempted to monopolize or conspired to monopolize in violation of law;
>
> (b) Whether Defendants artificially manipulated the price of aluminum in violation of the Sherman Act;
>
> (c) Whether Defendants' conduct had an anticompetitive and manipulative effect on

the prices of aluminum purchased or sold by Plaintiffs and the Class during the Class Period; and

(d) The appropriate measure of damages, under federal antitrust law sustained by Plaintiffs and other members of the Class as a result of Defendants' unlawful activities.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

77.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

**COUNT ONE**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT**

78.     Plaintiffs incorporate by reference the preceding allegations.

79.     Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of Section 2 of the

Sherman Act.

80.    During the Class Period, Defendants possessed market power in the market for the sale of aluminum.  Defendants have abused their monopoly power in order to limit unreasonably the free alienability of aluminum stored in Detroit warehousing to fabricators, processors, and other users of aluminum.

81.    The monopolization activities and the manipulation of the aluminum market and prices including: (1) monopolizing LME approved warehousing of aluminum in the United States; (2) creating a hoarding effect in aluminum through incentives and through restricting the amount of aluminum that is delivered to aluminum purchasers; (3) increasing storage rents and therefore premiums attached to the spot prices of aluminum; and (4) shuffling aluminum among warehouses to take inventory dark and then public which could benefit Goldman's aluminum-based derivative trading, is an unreasonable and unlawful restraint of trade.

82.    Defendants' resulting impact on the market for aluminum occurred in or affected interstate and international commerce.

83.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property.

84.    Plaintiffs and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A. For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives and their counsel as Class counsel;

B.  That the anticompetitive activities alleged herein be adjudged and decreed:

- A monopolization, attempt to monopolize, or conspiracy to monopolize in violation of Section 2 of the Sherman Act;

- An unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act; and

- A manipulation of the price of aluminum in violation of the Sherman Act;

C.  For a judgment awarding Plaintiffs and the Class damages against Defendants as a result of Defendants' unlawful conduct alleged herein, including treble damages and all other available damages whether punitive, exemplary or otherwise;

D.  For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

E.  For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: August 8, 2013

MORGAN & MORGAN, P.C.

By: _____

Peter Safirstein

Elizabeth S. Metcalf
28 W. 44th St., Suite 2001
New York, NY 10036
Telephone: (212) 564-1637
Facsimile: (212) 564-1807
Email: psafirstein@forthepeople.com
Email: emetcalf@forthepeople.com

Mike Espy
Omar L. Nelson
**MORGAN & MORGAN, LLC**
188 E. Capitol Street, Ste. 777
Jackson, Mississippi 39201
Telephone: (601) 949-3388
Facsimile: (601) 949-3399
Email: mespy@forthepeople.com
Email: onelson@forthepeople.com

Andrew J. Morganti
**MORGANTI LEGAL, P.C.**
535 Griswold Street, Suite 111-181
Detroit, MI 48226
Telephone: (888) 406-5991
Facsimile: (416) 800-2171
Email: amorganti@morgantilegal.com

Christopher S. Polaszek
**MORGAN & MORGAN, P.A.**
One Tampa City Center
201 N. Franklin St., 7th Fl.
Tampa, FL 33602
Telephone: (813) 314-6484
Facsimile: (813) 222-2406
Email: cpolaszek@MorganSecuritiesLaw.com

Azra Z. Mehdi
**THE MEHDI FIRM, P.C.**
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
Telephone: (415) 293-8039
Facsimile: (415) 293-8001
Email: azram@themehdifirm.com

*Counsel for Plaintiffs*